UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KYLE MICHAEL JONES,

                    Petitioner,                         Case No. 1:07-cv-894

v.                                                      Honorable Robert J. Jonker

MILLICENT WARREN,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner was convicted in the Kalamazoo County Circuit Court of assault with intent to

murder, MICH. COMP. LAWS § 750.83 and possession of a firearm during the commission of a

felony, MICH. COMP. LAWS § 750.227b.  On October 4, 2004, the trial court sentenced him to

imprisonment of fifteen to thirty years for the assault conviction and a consecutive two-year term

for the felony-firearm conviction.  In his *pro se* petition, Petitioner raises one ground for relief, as

follows:

> THE COURT DENIED [PETITIONER] HIS SIXTH AMENDMENT RIGHT TO
> CONFRONT HIS ACCUSER WHEN IT ADMITTED A PRIOR TESTIMONIAL
> STATEMENT OF UNAVAILABLE WITNESS KENDRICK TROUP,
> ERRONEOUSLY HOLDING THAT THE STATEMENT WAS ADMISSIBLE
> UNDER MRE 804(B).

Respondent filed an answer to the petition (docket #6) stating that the petition should be denied.

Upon review and applying the AEDPA standards, I find that Petitioner is not entitled to habeas

corpus relief.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from the shooting of Vertdell Burnette on October 29, 2003, in Kalamazoo, Michigan.  Petitioner was tried before a jury beginning on August 18, 2004 and concluding on September 8, 2004.[1]

Officer Jefferson Koch of the Kalamazoo Department of Public Safety was the first office who responded to 1051 Bridge Street.  (Tr. III, 327.)  Koch first noticed a black Pontiac sitting in the road with the driver's door standing open.  He then saw two women trying to assist a man who was laying on the porch area of the apartment building.  (Tr. III, 328.)

Officer William Moore of the Kalamazoo Department of Public Safety testified that at 3:30 p.m. on October 29, 2003, he received a call about a shooting victim at 1051 Bridge Street.  (Tr. III, 313-14.)  When Moore arrived, the victim was lying on the ground in front of an apartment complex; he was semi-conscious and covered in blood.  (Tr. III, 314-15.)  Moore observed two gunshot wounds in the victim's left thigh.  (Tr. III, 316.)  Moore administered first aid until an ambulance arrived and transported him to the hospital. (Tr. III, 321.)  When Moore asked the victim who shot him, the victim responded, "Some niggers from the east side."  (Tr. III, 325.)  Moore testified that a black Bonneville was parked in front of the apartment with the door wide open.  (Tr. III, 323, 347.)  There appeared to be bullet holes in the front windshield of the car.  (Tr. III, 349.)

---

[1]The trial transcripts will be referred to as follows:
Tr. I      Jury Trial Volume I, August 18, 2004, docket #13
Tr. II     Jury Trial Volume II, August 31, 2004, docket #14
Tr. III    Jury Trial Volume III, September 1, 2004, docket #15
Tr. IV     Jury Trial Volume IV, September 2, 2004, docket #16
Tr. V      Jury Trial Volume V, September 3, 2004, docket #17
Tr. VI     Jury Trial Volume VI, September 8, 2004, docket #18

Betty Bush testified that she lived in the Riverview Court apartment complex at 1051 Bridge Street on October 29, 2003. (Tr. III, 330-31.) Her son and daughter, Heather Bush, also lived with her. (Tr. III, 331.) Bush testified that the victim came to her door around 3:30 p.m. He fell down on the porch and was semi-conscious. (Tr. III, 332.) Bush called the police. (Tr. III, 333.) Bush noticed a black car in front of the apartment complex with the driver's door open. (Tr. III, 333.) The victim did not tell Bush who shot him. (Tr. III, 345.)

Vertdell Burnette testified that he lived on the north side of Kalamazoo with his grandmother. (Tr. III, 352.) On October 29, 2003, Burnette was with his friend, Chris, on the east side of Kalamazoo in the area of East Main and Edwin. (Tr. III, 353.) As they were walking down East Main Avenue, they were approached from behind by a group of male teenagers. Without any warning, Burnette was struck from behind in the chin. Burnette did not see the person who struck him, but then saw a black male with brass knuckles backing across the street. (Tr. III, 355-56.) Burnette did not know the boy who hit him or why he hit him. (Tr. III, 357-58.) The boy with the brass knuckles was joined by a group of friends across the street from Burnette. (Tr. III, 359-60.) The group of six to eleven boys was on the same side of the street at the food and beverage store and Burnette was across the street. (Tr. III, 359-62, 365-68.) The group was yelling things like, "Man, you better get off the east side." (Tr. III, 361.) Burnette was aware of some problems at that time between the north side and the east side. (Tr. III, 361-62.) The group was trying to advance toward Burnette, but were impeded by the traffic on East Main. (Tr. III, 368.) Burnette tried to call his brother for help on his cell phone, but then started to run. (Tr. III, 360, 370.)

Burnette testified that he ran down East Main toward a black Grand Prix parked across from the food and beverage store. (Tr. III, 369-71.) Burnette could see someone in the car

and wanted to ask for help. (Tr. III, 373.) Burnette then saw someone dragging a coat around the southwest corner of Edwin and East Main, the corner where the food and beverage store is located. (Tr. III, 374-78.) Burnette did not see a gun until shots were fired. (Tr. III, 374.) Burnette could see gunfire coming from the person with the coat. (Tr. III, 379.) Two people stood near the shooter and were jumping around and excited like they wanted to see something happen. (Tr. III, 379.) The driver of the black car fled and left the car running. As Burnette continued to move toward the car, it was struck by the gunfire. (Tr. III, 379-81.) He looked back and saw the person on the southwest corner aiming the gun at him. (Tr. III, 381.) The gun looked like a rifle and sounded like "tat, tat, tat" when it fired. (Tr. III, 382.) By the time Burnette got in the car, he had been shot twice in the left leg. (Tr. III, 385-89.) The gunfire continued as he got in the driver's seat of the car and drove away. (Tr. III, 391.) The first place that Burnette thought to go was Heather Bush's house on Bridge Street. (T. III, 391.) Burnette could see some smoke coming from the car and could tell that there was something wrong with the power steering. (Tr. III, 392-93.) When he arrived, Burnette called Bush on his phone and told her to open the door because he was shot. (Tr. III, 393.) As Burnette tried to move toward the apartment, he started to lose consciousness. (Tr. III, 393.)

Burnette testified that he did not recognize the person who shot him. (Tr. III, 394.) Burnett could see that the person was a black male. (Tr. III, 395.) He recalled seeing the person trying to maneuver or rack something on the side or top of the rifle. (Tr. III, 395.) Just before the gunfire started, the coat dropped behind the shooter, exposing the rifle. (Tr. III, 395-96.) Burnette testified that he did not know Petitioner and never stolen a gun from him. (Tr. III, 398.)

Michael Lasenby testified that he had been acquainted with Petitioner since elementary school. (Tr. III, 399-400.) Around October 30, the day after the shooting, Lasenby went

to a residence on Fairbanks to get a haircut from Petitioner's cousin, "Jug." (Tr. III, 401.) Petitioner

came in while Lasenby was getting his haircut. (Tr. III, 402.) While Jug was out of the room,

Petitioner asked Lasenby if he heard that Burnette had been shot and if he heard who did it. (Tr. III,

402-03.) Lasenby told Petitioner that he knew about the shooting and heard that Petitioner was

believed to be the shooter. (Tr. III, 403-04.) Petitioner told Lasenby that he did it and lifted up his

coat to show Lasenby a gun. (Tr. III, 404-05.) The gun was in the waistband of his pants, so

Lasenby could only see the handle. (Tr. III, 404, 411.) Lasenby described that the gun had a pistol

grip, but looked like a rifle that had most of the stock cut off. (Tr. III, 405.) He saw a clip in

Petitioner's coat that was curved like a banana. (Tr. III, 405-06.) When Jug came back in the room,

Petitioner left. (Tr. III, 404.) Lasenby did not come forward with this information until December

5, 2003, after he was caught with marijuana at school. (Tr. III, 414.) Lasenby volunteered the

information to take some heat off himself regarding the marijuana. (Tr. III, 414-15.) Lasenby later

changed his mind about wanting to testify against Petitioner, but testified he was telling the truth.

(Tr. III, 416-17.)

Kendrick Troup testified that he was a friend of Petitioner's. (Tr. III, 421.)[2] Troup

had difficulty testifying because he knew the shooter and did not want to get his friends in trouble.

(Tr. III, 421-22.) Troup testified that Erick Burnett struck the victim with brass knuckles. (Tr. III,

423-25.) When the questioning got to Petitioner, Troup again testified that he did not want to testify,

but he had been subpoenaed. (Tr. III, 426.) Troup testified that Petitioner was part of the group with

Erick. (Tr. III, 427.) According to Troup, Petitioner left and then came back. (Tr. III, 430-31.) He

came from a blue and white car parked behind the food and beverage store. (Tr. III, 431.) When

[2]As explained below, Troup's live trial testimony was later stricken by the trial court.

the prosecutor asked Troup if Petitioner had anything in his hands, Troup refused to answer the question. (Tr. III, 431-34.) After the jury was taken out of the courtroom, Troup told the court that he was Petitioner's friend and did not want to get him in trouble. (Tr. III, 434-36.)

The trial court made a separate record in chambers regarding the reason for Troup's refusal to testify. (Tr. III, 439.) Troup testified that he did not want to testify because he was getting threats that Petitioner's cousin, Shawn Lockett, would kill him if he testified against Petitioner. (Tr. III, 440-42.) According to Troup, he received three or four such threats. (Tr. III, 442.) Troup saw Shawn Lockett in the courtroom and was afraid to continue his testimony for fear that Lockett would kill him. (Tr. III, 443-44.) Troup also had seen two of Petitioner's female cousins and was afraid that they would relay his testimony to Lockettt. (Tr. III, 444.) According to Troup, Petitioner, Lockett and the two female cousins all were members of the East Side 100 gang. (Tr. III, 445-46.) Their gang affiliation added to his apprehension of being killed. (Tr. III, 446.) Troup testified that he only provided information after the officer at the high school promised that he would not be subpoenaed to testify at trial. (Tr. III, 450-51.) Troup admitted that he saw Petitioner shooting at the victim. (Tr. III, 453.)

Kalamazoo Police Detective Jeff Johnson testified that prosecution witness Michael Lasenby told him that "he's hearing from the grapevine about his testimony against Kyle Jones from different people that are still on the street and associating with the East Side 100 gang . . . ." (Tr. III, 456.) Johnson testified that the East Side 100 gang was associated with active investigations involving crimes of violence. (Tr. III, 456.) Most recently one of the gang leaders, Raymond Clark, was convicted in the shooting death of Aarin Fultz. (Tr. III., 457.) Johnson testified that Shawn Lockett threatened a witness in the Raymond Clark case. (Tr. III, 457.) According to

Johnson, the prosecutor brought witness intimidation charges against Lockett in connection with that case.[3] (Tr. III, 457-58.) Johnson also believed that Lockett and another man physically assaulted another witness in that case. (Tr. III, 458.) Johnson further testified that while they were investigating Petitioner in connection with the shooting in this case, a task force was formed with the Kalamazoo County Sheriff's Department as the result of a large number of assaultive crimes and shootings involving members of the East Side 100, including Raymond Clark, Rayshawn Clark, Petitioner, Shawn Lockett, Devon Jackson and Tyler Hill. (Tr. III, 459-60.) Many of the assaults were related to an ongoing dispute between a north side group and an east side group. (Tr. III, 460.)

With regard to Kendrick Troup, Johnson testified that the week before the trial began, he received a phone message from Troup's mother, Shequela White. (Tr. III, 462.) When Johnson returned her call, White informed him that a member of the East Side 100 came to their home "indicating that they received a letter from Kyle Jones telling them to come and fight Kendrick Troup to stop him from testifying in court." (Tr. III, 462.) When Johnson asked who the person was that came to their home, White could only provide the name "Philip." (Tr. III, 462.) Johnson put together a photo line-up and Troup identified Philip Johnson that morning as the person who made the threat. (Tr. III, 462, 464.) Troup did not want Johnson to do anything about the threat because he was afraid that it would make matters worse. (Tr. III, 463.)

After the testimony was taken in chambers, the prosecutor moved to have Shawn Lockett and Petitioner's two female cousins excluded from the courtroom. (Tr. III, 466.) The trial court granted the prosecutor's motion. (Tr. III, 467-474.) However, after consulting with counsel, Troup decided not to continue his testimony. (Tr. IV, 573.) His counsel explained that Troup "feels

---

[3]The charges against Lockett were later dropped.

that his life has been threatened and there's a very real possibility that threat could be carried out in this case." (Tr. IV, 573.) The prosecutor moved to hold Troup in contempt of court. (Tr. IV, 573-579.) The trial court made an interim ruling that Troup had until the close of proofs to change his mind and continue his testimony. (Tr. IV, 580.) The court indicated that if Troup refused to continue, it would strike his trial testimony because it was not subjected to cross-examination. (Tr. IV, 580-81.) The court further stated that if Troup did not continue, the prosecutor could file a petition to hold Troup in contempt. (Tr. IV, 581.)

The trial resumed and the prosecution called Dr. John Walsh who treated the victim at Borgess Hospital. When the victim arrived, he was in Class-I shock from having lost a great deal of blood due to two gunshot wounds. (Tr. III, 477.) One of the gunshot wounds went all the way through his left leg about six inches above the knee. (Tr. III, 478-79.) That wound was not life threatening. (Tr. III, 479.) The second shots entered his left hip and exited through the groin area. (Tr. III, 479-80.) That shot transected the femoral artery, which is the major vein in the body that brings blood back from the entire leg, so he was in danger of bleeding to death. (Tr. III, 477-78, 481.) Dr. Walsh performed emergency surgery and called in a vascular surgical specialist to assist him with the severe damage done to the area of the blood vessels. (Tr. III, 478.) The victim remained in critical condition for a period of time after the surgery and was not released until November 20. (Tr. III, 482.)

Officer Terry Thomas of the Kalamazoo Department of Public Safety testified that on October 29, 2003 at about 3:30 p.m. he received a call regarding shots fired in the area of East Main and Hazard. (Tr. III, 485.) Thomas did not see anything at East Main and Hazard, but as he proceeded to East Main and Edwin, he saw some shell casings laying on the ground. (Tr. III, 488.)

While he was securing the scene, a boy named Dion and his sister, Kayla Ferguson, gave him a baggy containing four shell casings that they found. (Tr. III, 489.) The casings in the baggie looked the same as the ones on the ground. (Tr. III, 489-90.) Thomas turned the baggie with the casings over to Officer Tracy Cochran. (Tr. III, 490.)

       Daniel Hummel testified that he lived at 627 Edwin Avenue on October 29, 2003. (Tr. IV, 498.) From the front porch of his house, Hummel could see the intersection of Edwin and East Main. (Tr. IV, 499.) Hummel heard some gunshots around 3:15 p.m. while he was sitting on his porch. (Tr. IV, 501-02.) He heard four or five shots just seconds apart that sounded like an AK47 assault riffle. (Tr. IV, 508-09.) Hummel looked in the direction of the shots and could see people running away. (Tr. IV, 502.) He saw a person with a weapon running back down Edwin from the corner. (Tr. IV, 503.) Hummel could not see the gunman's face, but it appeared to be a black male. (Tr. IV, 503, 505.) The weapon looked like a rifle, but Hummel did not get a full view because there was a jean jacket draped over the gun. (Tr. IV, 504.) The gunman was holding the gun out with both hands like you would hold a rifle. (Tr. IV, 505.) The gunman got into the back driver's side seat of a white and blue car that was parked across the street from Hummel's house. (Tr. IV, 505, 508.) Hummel identified People's Exhibit 16 as a photograph of the car. (Tr. IV, 507.) After the gunman got into the car, it drove away. (Tr. IV, 508.) Hummel testified that Thomas Rial, who lived with Hummel, got the license plate number from the blue and white car and gave it to police. (Tr. IV, 517.)

       Thomas Rial testified that on October 29, 2003, he lived at 627 Edwin Avenue with Daniel Hummel. (Tr. IV, 586.) Rial was in his bedroom when he heard the gunshots. (Tr. IV, 588.) Rial went out to the front porch to see what was going on. (Tr. IV, 589.) Rial saw a black male

jump in a car with a gun. (Tr. IV, 590.) Rial identified People's Exhibit #16 as the car. (Tr. IV, 590-93.) The car pulled into a driveway across the street before the gunman jumped in the passenger side of the car. (Tr. IV, 594.) The gun was covered with a coat, so Rial could only see the back end of it, but it looked like a rifle. (Tr. IV, 595-96.) The car pulled out of the driveway and went down Edwin away from East Main. (Tr. IV, 597.) Rial took down the license plate number and gave it to police. (Tr. IV, 597-98.)

Shawn Wright testified that he was driving a blue and white Chevy Caprice on October 29, 2003. (Tr. IV, 523-24.) He identified the car as People's Exhibit #16. (Tr. IV, 523.) Around 3:15 p.m., Wright was driving with one passenger in his car. (Tr. IV, 524.) Wright testified that he was familiar with his passenger, but did not really know him. The two drove to a location on Southworth to get marijuana. Wright then complied with his passenger's request to drive him and two other guys up to the food and beverage store on East Main. (Tr. IV, 526.) Wright pulled into the parking lot of the food and beverage store and pulled around the back of the store to the driveway on Edwin. (Tr. IV, 527.) The three passengers got out there. (Tr. IV, 528.) When Wright pulled out on Edwin he stopped for a couple of minutes to talk to someone that he knew. (Tr. IV, 529.) After that, he pulled into a driveway to turn around. (Tr. IV, 529.) At that point, Wright heard some gunshots coming from the direction of the corner of East Main and Edwin. (Tr. IV, 529-30). Wright looked up and saw several people running toward his car. (Tr. IV, 530.) The next thing he knew, a black male with a long black gun jumped into the back of his car. (Tr. IV, 530-31.) The gun was covered with a coat. (Tr. IV, 537.) Wright was in shock and started driving. (Tr. IV, 532.) Wright asked the man where he wanted to go and the gunman told him to let him out in the same general area where he picked up his three original passengers. (Tr. IV, 532-33.) Wright

assumed that the gunman was one of the three people that he picked up earlier.  (Tr. IV, 533.)  A couple of days after the shooting, someone pointed a person out to Wright as the shooter.  Wright believed that it was the guy who got into his car with the gun, but he wasn't completely certain.  (Tr. IV, 533.)  Wright identified Petitioner as the person he believed was the gunman.  (Tr IV, 534.)

After Wright dropped off the gunman, he drove around the corner to his cousin's house.  The car was registered in her name, so the license plate number would have led police to her address.  (Tr. IV, 535.)  Wright talked to the police when they arrived.  He did not tell them everything that he knew because he was afraid of being killed.  (Tr. IV, 536, 562.)  Wright explained that the code of the streets is "[d]on't snitch."  (Tr. IV, 536.)  Wright later provided more information to police because he was being investigated as the getaway driver and the police took his car and would not give it back.  (Tr. IV, 537, 558-59, 564-65.)  Wright provided some information during his first interview with Detective Johnson, but did not give Johnson the full story until the second interview on December 8, 2003.  (Tr. IV, 565-66.)

Kayla Ferguson testified that on the afternoon of October 29, 2003, she got off the school bus near the corner of East Main and Edwin.  (Tr. IV, 622.)  She heard one shot while she was on the bus and an additional eight or nine shots after she reached her home on East Main.  (Tr. IV, 623.)  When she got off the bus, she saw groups of people on both sides of the street shooting at each other.  (Tr. IV, 631-33.)  After the shots were fired, Ferguson and her brother walked over to the corner of East Main and Edwin near the food and beverage store.  (Tr. IV, 626.)  Her brother found bullet shells on the ground and picked them up.  (Tr. IV, 627.)  When the police arrived, they turned over the shells.  (Tr. IV, 627.)

Officer Tracy Cochran of the Kalamazoo Department of Public Safety testified that he examined and collected evidence from the black Pontiac that was stopped in the driving lane of a parking lot at 1051 Bridge Street. (Tr. IV, 635.) The car was still running and the driver's door was open. (*Id.*) There were at least five to six bullet holes in the car and a large pool of blood in the driver's seat. (Tr. IV 635-45, 651.) One of bullets severed a brake line, which caused brake fluid to leak on the ground. (Tr. IV, 649-51, 657). From the angle of the bullet holes, Cochran opined that the bullets were coming from the same trajectory path. (Tr. IV, 645-48.)

Cochran also examined the shooting scene at East Main and Edwin. Cochran found the same fluid on East Main in front of the food and beverage store that he found leaking from the abandoned Pontiac on Bridge Street. (Tr. IV, 655-56.) He also found some small pieces of shattered glass, which was consistent with the broken driver's door window. (Tr. IV, 657.) Cochran found cartridges on the corner of East Main and Edwin in the same area as the fluid and broken glass. (Tr. IV, 653, 657-58.) Cochran believed that the shooter was standing around the southwest corner of the intersection. (Tr. IV, 652, 660.) Cochran retrieved six rounds on the southwest corner of East Main and Edwin and Officer Thomas gave him another four rounds. (Tr. IV, 665.) All of the rounds were the same caliber, and, thus, could have been fired from the same weapon. (Tr. IV, 665, 669.) The caliber of bullet, approximately thirty caliber, could only be fired from a high-powered rifle such as an AK47. (Tr. IV, 670, 691.) According to Cochran, the rounds were consistent with those found in a banana clip or a shorter fixed clip. (Tr. IV, 692.)

Cochran further testified as an expert in the area of latent print examination and lifting. (Tr. IV, 668.) He examined the ten shell casings for fingerprints, but was unable to locate

any prints.  (Tr. IV, 670-71.)  Cochran lifted several latent finger prints from a blue and white Chevrolet for further testing.  (Tr. IV, 673-76.)

The parties stipulated that Officer Brett Apelgren of the Kalamazoo Department of Public Safety examined the finger prints lifted from the blue and white Chevrolet and found a match between Petitioner and fingerprint number 15.  (Tr. IV, 694.)

On Friday, September 3, 2004, the fifth day of trial, the prosecutor moved for the admission of Kendrick Troup's written statement to police under M.R.E. 804(b)(6), which allows the admission of a hearsay statement that is "offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."  (Tr. V, 705-718.)  After a discussion, the trial court adjourned the trial until the following Wednesday so that the parties could further develop their arguments with regard to the motion.  (Tr. V, 724-28.)  When the trial resumed on Wednesday, September 8, the prosecutor renewed his motion.  (Tr. VI, 737-53.)  After arguments by counsel, the trial court found credible evidence from the in camera testimony given by Officer Johnson that Petitioner engaged in or encouraged wrongdoing that rendered Troup unavailable and permitted the admission of his statement to police.  (Tr. VI, 772-74.)  The trial court stated in part:

> Based on the testimony of Detective Johnson, I'm satisfied that there's credible testimony making it far more probable than not that Mr. Jones has written a letter to Mr. Johnson, or to some other person, encouraging the principals within the gang of 100, or among the gang that has chosen to interject itself into these proceedings by their presence and their behavior, to go to Mr. Troup and procure his silence; that this was a result of wrongdoing intended to procure the unavailability of Mr. Troup as a witness; and that that [sic] wrongdoing is directly linked to the defendant who is a party.

> Again, the case of *Crawford* by the United States Supreme Court I think is, while instructive, is not applicable to this hearsay exception.  I think there's a long

- 13 -

tradition of militating circumstances against confrontation where there is misbehavior on the part of a party.

Admittedly, we don't have the letter. Admittedly, we don't have any testimony from Mr. [Philip] Johnson, which quite frankly he's going to deny he ever did it anyway if he knows what's good for him. I mean, he doesn't want to get an obstruction of justice charge.

Mr. Lockett isn't going to be coming in here and willingly say, "Oh yeah, we kind of conspired with one another to make sure Kendrick Troup doesn't testify because we don't want Kyle Jones to be convicted." That ain't going to happen.

But I think it is reliable, based on Detective Johnson's investigation and what was said to him, and based on what I've seen here in the courtroom versus the people who were in the audience, who by the way coincidentally haven't been back since Mr. Troup refused to testify, as near as I could tell, anyway, maybe they were; there's no question in anyone's mind that Mr. Troup's testimony had been tampered with, and it directly falls in the lap of Kyle Jones. Plain and simple.

***

Accordingly, I find that the statement made to police officers investigating this matter by Mr. Troup is a statement offered against a party, that is Kyle Jones;

That Mr. Jones has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of Mr. Troup as a witness, and therefore, is admissible.

(Tr. VI, 772-74.) The trial court struck Troup's earlier trial testimony from the record and instructed the jury to consider only his written statement. (Tr. VI, 774, 779.) The court denied defense counsel's motion for an adjournment to file an interlocutory appeal. (Tr. VI, 776-78.)

Detective Amy Hicok of the Kalamazoo Department of Public Safety testified that she met with Officer Chris Kloosterman and Kendrick Troup at Kalamazoo Central High School on January 21, 2003. (Tr. VI, 781.) They met at Officer Kloosterman's office at the high school. (Tr. VI, 781.) Troup provided information about the shooting of Vertdell Burnette, aka Bear. (Tr. VI, 782, 787.) Troup was seventeen years old. (Tr. VI, 795.) Troup told Hicok that he was standing

- 14 -

next to Petitioner when he was shooting at Burnette.  (Tr. VI, 783.)  Troup said that Petitioner was a friend and that he had known him for quite a while.  (Tr. VI, 783.)  Troup told Hicok that Petitioner used a newer model gun that he put together and held a banana clip with at least thirty bullets.  (Tr. VI, 784-85.)  Before Petitioner starting shooting at Burnette, he said, "Fuck that shit, I'm fittin' to shoot this nigger."  (Tr. VI, 786, 794.)  Troup thought Petitioner shot at least eight to ten rounds.  (Tr. VI, 786, 794.)  Troup also told Hicok that Erick Burnett hit Verdell Burnette with brass knuckles.  (Tr. VI, 787, 794.)

After the initial interview, Troup made a written statement.  (Tr. VI, 787-89.)  Troup signed the statement, which was witnessed by Hicok and Kloosterman.  (Tr. VI, 789.)  After Troup wrote his statement, Hicok reviewed the statement with him and wrote notes on the statement clarifying what Troup meant at various points in the statement.  (Tr. VI, 787.)  Due to the notations, Hicok could not simply read Troup's statement into the record.  Rather Hicok explained what Troup wrote with her added clarifications.  In his statement, Troup wrote that "Bear" came over on the block and "was taking [sic] stuff" to one of the people in his gang.  Troup told Hicok that "Bear" was Verdell Burnette.  (Tr. VI, 789-90.)  The person Bear was "talking stuff" to, Erick Burnett, got mad and got some brass knuckles and hit Bear in the head.  (Tr. VI, 790-91.)  Troup continued, "And Bear called some of his friends . . . [b]ut they did not come so he got mad . . . [b]ecause he said somebody stole his dope . . . [s]o he started talking stuff."  (Tr. VI, 791-72.)  Hicok thought Troup meant that Petitioner got mad, but he also could have meant Bear.  (Tr. VI, 792.)  Troup continued that Kyle Jones went to get his gun.  (Tr. VI, 793.)  According to the written statement, Troup was standing next to Petitioner when he said "I'm about to shoot that nigger," and then started shooting.  (Tr. VI, 793.)  After the shooting, Petitioner ran.  (Tr. VI, 793.)

While it was not in Troup's written statement, Hicok's police report indicated that Troup told her that Vertdell Burnette had stolen a gun from Petitioner and Petitioner wanted it back. (Tr. VI, 797.) Based upon Troup's statements, Hicok believed that there was a verbal exchange between Petitioner and the victim before Petitioner started shooting. (Tr. VI, 797-98.) Troup did not know if anyone was hit by the gunfire. (Tr. VI, 798.) Hicok did not know whether Officer Kloosterman told Troup that he would not be subpoenaed. (Tr. VI, 801.)

Ophelia Lockett testified that Petitioner was her great-nephew. (Tr. IV, 808.) Ophelia lived in a townhouse on Sherwood Street which was about half a block from the Avenue Food and Beverage Store. (Tr. VI, 808-809.) Petitioner was at her house a few times a week. (Tr. VI, 814.) Ophelia testified that cars often parked at the townhouses where she lived such that they overlapped the sidewalk. (Tr. IV, 811-815.) According to Ophelia, people walking down the sidewalk often walk between the cars and brush up against them or touch them. (Tr. VI, 814-15.)

Betty Lockett, Petitioner's great-grandmother, testified that in October 2002, Petitioner lived between her house and Ophelia's Lockett's house, which were about two-and-a-half blocks apart. (Tr. VI, 817.) Betty testified that she had three foster children and an adopted daughter living at her home, as well as many grandchildren and great grandchildren who came for meals and visited her home almost daily. (Tr. VI, 818, 821-23.) Betty testified that her grandson, Jamar Lockett, made extra money cutting hair at her home. (Tr. VI, 819.) Jamar worked at Auto Zone during the week, so he only cut hair on the weekends. (Tr. VI, 820.) Betty did not know Michael Lasenby and did not recall seeing him in her home for a haircut. (Tr. VI, 821.) Betty testified that she paid attention to who was coming into her house for a haircut and asked Jamar if she did not know the person. (Tr. VI, 825.)

The preliminary examination testimony of Jamar Lockett was read into the record because he was unavailable for trial. (Tr. VI, 826-28, 838.) Jamar, aka Jug, testified that he was Petitioner's first cousin and Betty Lockett's grandson. (Tr. VI, 830.) Jamar testified that he cut hair on weekends at Betty's house at 724 Fairbanks. (Tr. VI, 831.) Jamar claimed that he did not cut hair on Thursday, October 30, 2003, but admitted that he cut Michael Lasenby's hair once or twice. (Tr. VI, 831-33.) Jamar believed that he last cut Lasenby's hair the previous summer, but did not keep an appointment book. (Tr. VI, 833.)

At the close of proofs, Defense counsel moved for mistrial based upon the admission of Troup's statement to police, which was denied by the trial court. (Tr. VI, 838-845.)

At the conclusion of trial, on September 8, 2004, the jury found Petitioner guilty of assault with intent to murder and felony-firearm. (Tr. VI, 923-24**.**) On October 4, 2004, the trial court sentenced him to imprisonment of fifteen to thirty years for the assault conviction and a consecutive two-year term for the felony-firearm conviction. (Sentencing Transcript, 16-17, docket #19.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on May 12, 2005, raised the same issue presented in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #20.) In an opinion issued on March 7, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction and sentence. *See People v. Jones*, 714 N.W.2d 362 (Mich. Ct. App. 2006) (docket #20).

Petitioner filed an application for leave to appeal to the Michigan Supreme Court. He presented the same claim raised before and rejected by the Michigan Court of Appeals. By order

entered September 26, 2006, the Michigan Supreme Court denied his application for leave to appeal

because it was not persuaded that the questions presented should be reviewed.  *See People v. Jones*,

721 N.W.2d 215 (Mich. 2006) (docket #21).

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

at 655.  In determining whether federal law is clearly established, the Court may not consider the

decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th

Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time [the

petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

### Discussion

In his petition, Petitioner contends that the trial court violated his Sixth Amendment right to confrontation when it admitted Kendrick Troup's statement to police under M.R.E. 804(B).[4] The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process

---

[4]The extraordinary remedy of habeas corpus lies only for a violation of the United States Constitution. 28 U.S.C. § 2254(a). Thus, to the extent Petitioner contends that the admission of Troup's statement to police violated the Michigan Constitution, Michigan case law or statute, or the Michigan Rules of Evidence, such claims are not cognizable on federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62 (1991).

Clause. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965). For over twenty years, courts analyzed confrontation challenges using *Ohio v. Roberts*, 448 U.S. 56 (1980), under which hearsay statements were admissible so long as they bore sufficient "indicia of reliability," that is, if they fell into a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.* at 66. In *Crawford v. Washington*, 541 U.S. 36 (2004), which was decided months before Petitioner's trial, the Supreme Court revised its understanding of the confrontation right. The Court held that if a hearsay statement is testimonial, it can be admitted against a criminal defendant only if the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 59. Although the Court left unanswered whether *Roberts* still governed non-testimonial hearsay, *id.* at 68, it later held that the Confrontation Clause did not apply to non-testimonial statements, abrogating *Roberts* in full, *see Davis v. Washington*, 547 U.S. 813, 821 (2006).

In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court clearly held that, "Statements taken by police officers in the course of interrogations are . . . testimonial even under a narrow standard." *Crawford,* 541 U.S. at

52.  Consequently, Troup's statement to police clearly constituted testimonial hearsay under *Crawford*.

An exception to the Sixth Amendment right of confrontation which survived the Supreme Court's decision in *Crawford* is the doctrine of forfeiture by wrongdoing.  *Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds.")  Pursuant to the forfeiture by wrongdoing exception, the defendant forfeits his confrontation rights where he is responsible for the witness's unavailability. *United States v. Garcia-Meza*, 403 F.3d 364, 370 (6th Cir. 2005).  This is an equitable rule which prevents the defendant from taking advantage of his own wrongful conduct.  *Id.*  In this case, the trial court admitted Troup's statements pursuant to M.R.E. 804(b)(6), which codifies the so-called forfeiture by wrongdoing doctrine.  Under the Rule, the hearsay rule does not bar "a statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."  The federal version of the rule is somewhat broader than the Michigan rule in that it allows the admission of "a statement offered against a party that has *engaged or acquiesced* in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."  See FED. R. EVID. 804(b)(6) (emphasis added).  In *Davis*, the Court explicitly recognized the continuing validity of the forfeiture by wrongdoing doctrine notwithstanding *Crawford*:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce.  While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.  We reiterate what we said in *Crawford*: that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds."  That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

*Davis*, 126 S.Ct. at 2280 (citations omitted) (*quoting Crawford*, 541 U.S. at 62).

The Sixth Circuit has held that, in order for the doctrine of forfeiture by wrongdoing to apply, the proponent of the hearsay statement has the burden of persuasion of showing procurement of unavailability by a preponderance of the evidence,[5] "but once evidence is produced that demonstrates good reason to believe the defendant has interfered with the witness, adverse inferences may be drawn from the failure of the defense to offer credible evidence to the contrary." *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). The *Davis* Court did not identify the standard applicable to determining whether the forfeiture by wrongdoing exception may be invoked to admit otherwise barred testimonial hearsay. The Court did note, however, that federal courts applying Rule 804(b)(6), and many state courts applying state law analogues, have applied a preponderance of the evidence standard. *See Davis*, 126 S. Ct. at 2280. Subsequently, in *Giles*, 128 S. Ct. at 2683, the Supreme Court held that the doctrine applies only "when the defendant engaged in conduct designed to prevent the witness from testifying." In other words, "the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *Id.* at 2687. Therefore, the proponent of a hearsay statement invoking the forfeiture by wrongdoing exception has the burden of showing by a preponderance of the evidence that the party opposing admission of the hearsay statements engaged in conduct designed to procure the unavailability of the witness. *See Beckett v. Ford*, __ F.3d. __, 2010 WL 2617077, at *12 (6th Cir. June 24, 2010); *Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 366 (2009).

Applying the preponderance of the evidence standard, the Michigan Court of Appeals

---

[5]According to the Sixth Circuit, the definition of preponderance of the evidence is "evidence that is of greater weight, on balance, than that offered in opposition to it." *Benge v. Johnson*, 474 F.3d 236, 248 (6th Cir. 2007) (citing 32A C.J.S. Evidence § 1312 (2006)). It also has defined this evidentiary burden as a showing of that which is "more likely than not." *United States v. Moses*, 289 F.3d 847, 852 (6th Cir. 2002).

found that the prosecutor met his burden of establishing that Petitioner engaged in or encouraged

wrongdoing that rendered Troup unavailable to testify at trial:

> In the present case, there appears to be no disagreement that Troup refused to testify about defendant's role in the shooting because of threats and fear of retribution.[2] However, because there was no evidence that defendant himself directly threatened Troup, the key dispute is whether the evidence of indirect threats established that defendant "engaged in or encouraged wrongdoing." MRE 804(b)(6). Given Troup's initial testimony in court, subsequent statements by Troup and Officer Johnson during a separate hearing concerning Troup's refusal to testify, and other evidence before the court, we find no error in the court's determination that defendant engaged in or encouraged wrongdoing. There was ample evidence of the threats to Troup to prevent him from testifying against defendant and of the practice of witness intimidation by persons affiliated with the East Side 100 gang, who were the source of Troup's intimidation.

> In the courtroom, Troup declined to testify further after initially providing details of the events surrounding the shooting. However, in a separate hearing in chambers to determine appropriate courtroom procedures to secure Troup's testimony, the court heard statements under oath from Troup and Officer Johnson, who had investigated the threats against Troup. Troup testified that he had received word that Shawn Lockett, defendant's cousin, would kill him if Lockett saw him testifying in court, which was one of at least three death threats Troup received. He was also afraid that two female relatives of Lockett, who were cousins of defendant and were in the courtroom, would relay Troup's testimony to Lockett. Troup stated that the girls and Lockett were members of the East Side 100 gang. He also acknowledged that defendant was a member of the gang, which added to his reluctance to testify. After leaving the hearing with his mother to consult with counsel provided through the court, Troup refused to testify further.

> The court then heard testimony from Officer Johnson, who testified that sometime in the preceding weekend, Troup's mother called him and reported that a person named Philip, who was a member of the East Side 100 gang, came to her home and indicated that "they" had received a letter from defendant telling them to come and fight Troup to stop him from testifying. Officer Johnson stated that on the morning of the hearing, Troup identified the visitor as Philip Johnson in a photo lineup; however, Troup was afraid that if Officer Johnson took any action concerning Philip's threat, it would only exacerbate Troup's problems with the East Side 100 gang. Officer Johnson testified that another witness, Michael Lasenby, also received threats from individuals associated with the East Side 100 gang about his testimony, and that the East Side 100 gang has a history of involvement with other violent crime investigations, including shootings between the feuding north side and east side groups. Defense counsel acknowledged that Lockett had been charged with

intimidating a witness in another trial reportedly involving a defendant who was one of the leaders of the East Side 100 gang, although he was not bound over on the charges.

Defendant takes issue with the fact that the court relied on testimony from Officer Johnson concerning Phillip Johnson's threat and the alleged letter from defendant, rather than on direct testimony from Troup or his mother. However, under the circumstances of this case, we do not find that the lack of direct evidence precludes a finding of defendant's wrongdoing,[3] particularly in light of the evidentiary rule's purpose.

"Rule 804(b)(6) . . . is an attempt to respond to the problem of witness intimidation whereby the criminal defendant, his associates, or friends through one means or another, often a simple telephone call, procures the unavailability of the witness at trial and thereby benefits from the wrongdoing by depriving the trier of fact of relevant testimony of a potential witness." Anno: *Construction and application of Fed Rules Evid Rule 804(b)(6), 28 U.S.C.A., hearsay exception based on unavailable witness' wrongfully procured absence*, 193 A.L.R. Fed. 703; *see also Scott, supra* at 763-764, quoting 30B Graham, Federal Practice & Procedure (2000 interim ed.) § 7078, p. 702 ("'Rule 804(b)(6) is an attempt to respond to the problem of witness intimidation whereby the criminal defendant . . . through one means or another, often a simple telephone call, procures the unavailability of the witness at trial. . . .'").

To the extent that the court's finding rested on Officer Johnson's credibility, it was a matter for the trial court to decide. The court expressly stated that it found the testimony of Troup and Officer Johnson credible with respect to the threats to prevent Troup from testifying. Moreover, the trial court could infer from the evidence before it that defendant had a role in intimidating or issuing the death threat to silence Troup, given the history of witness intimidation by those involved, their personal relationships, and their affiliation with the East Side 100 gang.

Rule 804(b)(6) "contemplates application against the use of coercion, undue influence, or pressure to silence testimony and impede the truth-finding function of trials." *Scott, supra* at 764. "[A]pplying pressure on a potential witness not to testify, including by threats of harm and suggestion of future retribution, is wrongdoing." *Id.* This case, although a close call, is essentially a "battle of inferences," *id.*, and we cannot conclude that the court erred in inferring that defendant was involved in intimidating Troup to prevent him from testifying. We find no abuse of discretion in the admission of Troup's statement under MRE 804(b)(6).

[2]Troup was called as a witness and testified about the events preceding the shooting, including that he knew Burnette, the victim, and that he and defendant were friends. He provided details of the confrontation and events surrounding the shooting. He identified who hit Burnette with the brass knuckles, but became

nonresponsive when the questioning began to focus on defendant. Troup's responses were inaudible, and he covered his mouth with his hand as he replied to questions. The court questioned Troup about his refusal to testify, and Troup stated that the reason he did not want to testify in court was that he was getting death threats.

[3] Under MRE 1101(b)(1), the rules of evidence do not apply to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104(a)." MRE 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court," and, in ruling on preliminary questions of admissibility, the trial court is "not bound by the Rules of Evidence, except those with respect to privileges."

[4] Because Troup's statement was admissible under MRE 804(b)(6), we do not address defendant's argument that Troup's statement would have been inadmissible under MRE 804(b)(7).

*Jones*, 714 N.W.2d at 369-71.

Petitioner argues that the state courts should have used the clear and convincing evidence standard rather than the preponderance of the evidence standard in determining whether Petitioner engaged in or encouraged wrongdoing that resulted in Troup's unavailability. He further contends that under either standard of proof, the prosecutor failed to sufficiently prove that Petitioner procured Troup's unavailability. Petitioner contends that Troup never testified that Petitioner threatened him or that Philip Johnson, or anyone else, threatened him on behalf of Petitioner. Troup only testified on the separate record that he "received word" that Petitioner's cousin, Shawn Lockett would kill him if he testified against Petitioner. Likewise, the prosecutor did not call Troup's mother, Shequila White, to testify regarding the alleged threats received by her son in connection with the trial. According to Petitioner, the only evidence linking him to the threats was the at least third-hand hearsay testimony of Detective Johnson regarding the letter allegedly written by Petitioner. As Petitioner puts it, his "confrontation rights should not be denied based on what Kendrick Troup's mother told a police officer about what an unknown Philip Johnson told her

about what Kyle Jones supposed[ly] told him in a letter tha[t] no one ever saw." (Pet., Appendix A, Page ID# 8.) Petitioner further claims that the constitutional error was not harmless.

As previously discussed, the Supreme Court declined to decide the burden of proof for showing procurement of unavailability, but suggested the preponderance of the evidence standard, stating:

> We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard, *see, e.g., United States v. Scott*, 284 F.3d 758, 762 (C.A.7 2002). State courts tend to follow the same practice, *see, e.g., Commonwealth v. Edwards*, 444 Mass. 526, 542, 830 N.E.2d 158, 172 (2005). Moreover, if a hearing on forfeiture is required, *Edwards*, for instance, observed that "hearsay evidence, including the unavailable witness's out-of-court statements, may be considered." *Id.*, at 545, 830 N.E.2d, at 174.

*See Davis*, 547 U.S. at 833. In cases following *Davis*, the Sixth Circuit has adopted the preponderance of the evidence standard. *See Davis*, 126 S. Ct. at 2280; *Beckett*, 2010 WL 2617077, at *12; *Doan*, 548 F.3d at 458. The preceding passage from *Davis* also opened the door to the trial court's use of hearsay statements in determining whether a defendant forfeited his confrontation rights. Thus, while Detective Johnson's in-chambers testimony undeniably involved multiple layers of hearsay, I cannot find that the trial court's reliance of Officer Johnson's testimony violated "clearly established" Supreme Court precedent as required by the AEDPA to grant habeas corpus relief.

Similarly, the decision of the state court was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. For purposes of habeas review, a state court's determinations of factual issues are presumed correct, and

the petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  That deference extends to the state court's credibility assessments, *see Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000), and to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302,1310 (6th Cir. 1996).  "Indeed, the presumption applies with particular force to credibility determinations, as the Supreme Court has ruled that such determinations receive 'special deference' from the federal courts."  *Id.* (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).  The same presumption also applies to state appellate courts' findings of fact made on review of the state trial record.  *Sumner v. Mata*, 449 U.S. 539 (1981); *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003).

As outlined above by the Michigan Court of Appeals, the prosecutor offered sufficient evidence from which the trial court could reasonably conclude by a preponderance of the evidence  that Petitioner engaged in conduct designed to procure the unavailability of the witness.  The trial court found credible Detective's Johnson's testimony regarding his conversation with Troup's mother, Shequela White.  White informed Johnson that a member of the East Side 100 gang came to their home "indicating that they received a letter from Kyle Jones telling them to come and fight Kendrick Troup to stop him from testifying in court."  (Tr. III, 462.)  White told Johnson that the person who came to their house was named "Philip."  (Tr. III, 462.)  Johnson testified that he put together a photo line-up and Troup identified Philip Johnson as the person who made the threat.  (Tr. III, 462, 464.)  Petitioner makes much of the fact that the prosecutor did not question Troup and White directly about Philip Johnson and the alleged letter, but the prosecutor could not have anticipated Troup's refusal to testify after he took the stand and had no opportunity to prepare before

the testimony was taken in the judge's chambers. Moreover, while Troup did not testify directly

about Philip Johnson or the alleged letter written by Petitioner, he testified that he received several

threats that Shawn Locket, Petitioner's cousin and fellow gang member, would kill him if he

testified against Petitioner. (Tr. III, 440-44.) Troup also expressed fear of two women seated in the

courtroom, who also were Petitioner's cousins and members of the East Side 100 gang. (Tr. III,

444-46.) Thus, Troup's testimony supported the prosecutor's theory that Petitioner was encouraging

or acting in concert with members of the East Side 100 gang to intimidate Troup so that he would

not testify at Petitioner's trial.

Applying the AEDPA standards, Petitioner is not entitled to habeas corpus relief.

Because there was no clearly established Constitutional error requiring habeas corpus relief, the

Court need not consider whether the error was harmless.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Dated:  August 20, 2010                        /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely
objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).